UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

```
Damien C.,                      )
                                )
      Plaintiff,                )
                                )
      v.                        )    Case No. 2:19-cv-96
                                )
Commissioner of the Social      )
Security Administration,        )
                                )
      Defendant.                )
```

## OPINION AND ORDER

Plaintiff Damien C. brings this action pursuant to 42 U.S.C. § 405(g), requesting reversal of the Social Security Commissioner's decision denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  Pending before the Court are Plaintiff's motion for reversal and the Commissioner's motion to affirm.  For the reasons set forth below, Plaintiff's motion is granted and the Commissioner's motion is denied.

## Background

### I.   Medical History

Plaintiff was born on September 27, 1977.  He worked as a car salesman from 2001 to 2004, and as a mason from 2004 through 2008.  In August 2008, he fell while doing chimney repairs and broke both ankles.  He had surgeries in December 2008 and June 2009, and additional surgeries on his right foot and ankle in 2010, 2013 and 2014.

Plaintiff was evaluated by Dr. Mark Charlson, an orthopedic surgeon, on April 22, 2015.  He reported to Dr. Charlson that he was experiencing right foot pain and considering amputation. Plaintiff had not been able to work since his original injury in 2008.  After evaluating Plaintiff again on June 12, 2015, Dr. Charlson diagnosed chronic pain with a nonunion subtalar joint. He suggested transtibial amputation, and performed the amputation on June 25, 2015.  Plaintiff claims disability as of the amputation date.

On June 26, 2015 and September 16, 2015, Plaintiff was seen by prosthetist Sarah Thomas.  He was fitted for a prosthesis on September 30, 2015.  After the fitting, Ms. Thomas noted that Plaintiff was able to walk with his rolling walker without difficulty.

During a reexamination on November 2, 2015, Plaintiff reported not wearing the prosthesis because of pain at the incision line.  On January 22, 2016, Ms. Thomas wrote that Plaintiff had recently been doing well with his prosthesis and had been wearing it for full days, but was not wearing it during the appointment.

On February 17, 2016, Plaintiff was able to walk from the parking lot to his appointment with physical therapist Sharon Hallman.  He nonetheless reported chronic neuropathic pain, back pain from a lumbar disc issue, and a limited ability to bear

2

weight on his left wrist.  Plaintiff reported that he had been doing some walking, using the wheelchair to provide pain relief and to limit the duration of weight bearing.

After Ms. Thomas noted that Plaintiff's current prosthesis was performing poorly, Plaintiff was fitted for a new prosthesis on June 1, 2016.  On June 8, 2016, Plaintiff reported to Ms. Thomas that he had worn the prosthesis all week without any major issues.  He was happy with the fit and function, and had little soreness.

On November 17, 2016, Dr. Charlson noted that while Plaintiff was moving around well, he was still having nerve pain that was hard to manage.  "The nerve pain influences his entire life, making it hard to do anything and keeping him awake at night.  The pain is located both laterally and medially and comes on with anything touching his amputation."  AR 1238.  Dr. Charlson prescribed gabapentin and recommended physical therapy and massage.

On December 5, 2016, Plaintiff saw PA Susan Brodeur relative to his complaints of back pain and left wrist pain.  It was noted at the time that he had a normal gait and walked without an assistive device.  While Plaintiff had full motor strength of the extremities, he had limited range of motion in his low back. Gabapentin and amitriptyline were prescribed, and a lumbar facet injection was administered on December 7, 2016.

3

On February 16, 2017, Dr. Charlson noted that Plaintiff was having significant nerve pain despite the pain medication.  Most of the pain was in the tibia and felt like severe cramping.  Upon examination, Dr. Charlson found irritation over the superficial peroneal nerve, and concluded that Plaintiff was having nerve-type pain that was not likely a neuroma.  He also believed Plaintiff was dealing with phantom pain, as Plaintiff had experienced pain for quite a long time prior to the amputation.  Dr. Charlson increased the dosage of gabapentin.

With respect to Plaintiff's ability to work, Dr. Charlson wrote: "Due to his neuropathic pain in the right lower extremity, it is not recommended that he work at this time as he does not have the necessary ability to wear his prosthesis for a considerable amount of time and is unable to focus and concentrate for prolonged periods."  AR 1395.  Dr. Charlson also opined that Plaintiff's "medication causes difficulty with concentration and attentiveness to detail.  It is my medical opinion that he not work and by working he could cause himself further harm."  AR 1510.

Plaintiff was evaluated for left wrist and back pain in March 2017.  Nerve conduction studies of the wrist were equivocal.  A physical examination showed tenderness around the left wrist surgical scar with reports of numbness.  An April 2017 MRI of the lower spine showed a disc bulge and mild to moderate

stenosis in the region of the lumbar spine.  An April 27, 2017 examination of Plaintiff's left wrist showed tenderness with "fairly good" motion.  AR 1458.

On May 15, 2017, state agency consultant Dr. Rebecca Winokur examined Plaintiff's medical records and opined that he could lift and carry up to 50 pounds occasionally, 25 pounds frequently, and stand and/or walk and sit for approximately six out of eight hours each workday.  Dr. Winokur also concluded that Plaintiff could never climb ladders, ropes or scaffolds, crouch, kneel or crawl; could occasionally climb ramps and stairs; and could frequently balance.  She believed Plaintiff should avoid even moderate exposure to hazards.

Plaintiff was last insured on July 10, 2017.

On January 26, 2018, Plaintiff arrived in his wheelchair for a prosthetic fitting, as his old prosthetic was too painful to wear.  On February 21, 2018, he reported that the new prosthetic was mostly comfortable.  On April 3, 2018 he confirmed that he was doing well and needed only an alignment adjustment.

In April 2018, occupational therapist Mark Coleman performed a functional capacity evaluation ("FCE").  The evaluation concluded that Plaintiff was functioning at a sedentary work capacity, and that it was questionable whether he would be able to manage such a capacity for more than four hours per day.  Mr. Coleman further found that Plaintiff could lift 10 pounds

occasionally, sit for four hours out of eight and for 20-30 minutes at a time, could stand or walk for one to two hours out of eight and for 15-20 minutes at a time.  He noted that Plaintiff's effort during testing was good.  On May 2, 2018, Dr. Charlson reviewed the FCE findings and confirmed that they were an accurate assessment of Plaintiff's ability to work during a standard week.

During his alleged period of disability, Plaintiff reported suffering from anxiety and depression.  His mental health provider was psychiatric nurse practitioner Louise Moon Rosales, APRN, whom he began seeing in November 2014.  On April 8, 2015, Ms. Rosales reported that Plaintiff's mood was improving after taking Cymbalta, although he continued to struggle with depression.

In September 2015, Ms. Rosales reported that Plaintiff's mood was discouraged following his right foot amputation.  He also had trouble sleeping, and felt that the Cymbalta was losing some efficacy.  Plaintiff's mood and sleep had improved as of February 2016, yet in May 2016 he was experiencing increased anxiety.

In June 2016, Ms. Rosales observed that Plaintiff continued to struggle with pain, depression and anxiety.  In September 2016, during an urgent follow-up visit, she noted that Plaintiff was feeling angry, rageful and very irritable.  During a December

15, 2016 exam, Ms. Rosales noted that Plaintiff's mood was depressed, his affect flat, and that he was sad with only fair eye contact.  He had suicidal ideas but no intent or plan.

Plaintiff applied for DIB on September 1, 2016.  In a function report dated December 6, 2016, he said he engaged in activities that included feeding and letting out his dogs, using a computer, performing household chores, and grocery shopping. He was able to care for his personal needs with some physical problems.  He went out once or twice weekly, and used a wheelchair when he could not walk well.  He could focus most of the time and follow verbal instructions, but did not handle stress well.

In January 2017, Ms. Rosales concluded that Plaintiff suffered from major depression with symptoms complicated by chronic pain.  Plaintiff had moderate limitations in his ability to interact with others and to maintain concentration, persistence, and pace.  Ms. Rosales further opined that Plaintiff would be unable to handle more than routine and superficial interactions with co-workers and supervisors due to irritability, and that while he could handle regular interactions with the public, he could not cope with normal work stress.

State agency psychologists Patalano and Atkins subsequently reviewed Plaintiff's records, concluding on January 31, 2017 and again on May 11, 2017 that Plaintiff did not have a severe mental

impairment.  AR 158, 178.  Those conclusions were based, in part, on counseling records.  Dr. Patalano found that Plaintiff had mild impairments in performing activities of daily living.  Dr. Atkins found mild limitations in understanding, remembering  or applying information, interacting with others, concentrating, and persisting or maintaining pace.

Plaintiff was treated by psychotherapist Leah Barth, MA, from May 2016 through February 2018.  On February 27, 2018, Ms. Barth diagnosed him with persistent depressive disorder.  His symptoms reportedly included lack of energy; hopelessness; trouble concentrating; irritability; feeling incapable; decreased activity, effectiveness, and productivity; avoidance of social activities; poor appetite; and sleep problems.  Plaintiff's depressive symptoms fluctuated from mild to severe over long periods, and impacted his ability to stay focused and adapt to changes in established routines.

On April 12, 2018, Plaintiff presented to the emergency department after trying to kill himself with pills.

## II.  **Hearing Testimony**

Plaintiff's DIB claim was denied initially on March 1, 2017. He requested reconsideration on April 10, 2017, and reconsideration was denied on June 7, 2017.  Plaintiff requested a hearing, which was held before Administrative Law Judge ("ALJ") Thomas Merrill from Manchester, New Hampshire on June 27, 2018.

During the hearing, ALJ Merrill called a medical expert, orthopedic surgeon Dr. John Kwock, to testify.  Dr. Kwock noted Plaintiff's below-the-knee amputation, a wrist fracture and fractures of both feet due to a fall at work.  Although the fractures were treated surgically, Plaintiff had developed residual traumatic arthritis, carpal tunnel in his wrist and hammertoe in his left foot.  Dr. Kwock also noted Plaintiff's back issues, which led to a decompression and fusion in January 2015.

Dr. Kwock testified that although Plaintiff continued to have problems with his right foot, the injury did not meet or equal a listed medical condition.  He further testified that, in his opinion, Plaintiff could lift between 11 and 20 pounds occasionally and up to 10 pounds frequently; could sit for up to six hours and stand or walk for up to four hours out of eight; could reach continuously; could handle, finger, and feel frequently with his left hand; could do those things continuously with his right hand; could frequently push and pull with his left arm, and continuously with his right arm; and could use his feet for controls occasionally.  Dr. Kwock believed that Plaintiff could climb stairs and ramps, but not ladders or scaffolding; could balance frequently, stoop occasionally, and kneel frequently; could never crouch, crawl, or work from unprotected heights; and should not work in proximity to moving machinery.

Upon cross-examination, Dr. Kwock stated that difficulties with fitting a prosthetic were unrelated to a person's ability to function, and that Plaintiff's "neuropathic pain" was subjective and not a focused diagnosis. He testified that he does not put much weight on functional capacity evaluations, and that he knows of no support for the proposition that a functional capacity evaluation performed in person is more reliable than a records review.

Plaintiff also testified at the hearing. As of that date, a new prosthetic had been fitted for him but he was still experiencing nerve pain. While the pain varied, at times it was unbearable after 30 to 45 minutes. At other times he could be on the prosthetic for up to six hours. Over the previous few days he had been able to wear it an hour or two each day.

Plaintiff attended the hearing in his wheelchair. He was unable to use crutches because of his left wrist pain. He is left-hand dominant, but was only able to use his left hand for approximately 20-30 minutes out of each hour.

Vocational expert Dennis King testified as well. The ALJ asked Mr. King to assume an individual who could lift 20 pounds occasionally, 10 pounds frequently, stand and walk for four hours, and sit for six hours. The hypothetical also included a claimant who is able to reach continuously, handle, finger, feel, push and pull frequently with the left arm and continuously with

the right arm, occasionally use his feet to operate controls, and frequently climb stairs and ramps. The claimant could balance, kneel and occasionally stoop. Based on these assumptions, Mr. King testified that such an individual could perform Plaintiff's past relevant work as a car salesman, as well as other jobs including survey worker, information clerk, and fundraiser. Mr. King also stated that each of these jobs could be performed by someone in a wheelchair.

## III. **The ALJ's Decision**

The Social Security regulations provide a five-step sequential process for evaluating disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir.

11

1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

In this case, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of June 25, 2015.  At step two, the ALJ concluded that Plaintiff had severe impairments consisting of degenerative disc

12

disease, below the knee amputation of the right lower extremity, and left carpal tunnel syndrome.  At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appending 1 (Listing).

The ALJ also found, consistent with the hypothetical presented to the vocational expert, that Plaintiff had the RFC to sit for up to six hours; stand and walk for up to four hours; reach, handle, finger and feel with the right upper extremity, reach on a continuous basis with the left upper extremity; push and pull frequently with the left upper extremity; push and pull continuously with the right upper extremity; and occasionally use foot control bilaterally.  The ALJ concluded that Plaintiff could not climb ladders, ropes or scaffolds, and could not crawl or crouch.  He found that Plaintiff could frequently climb ramps and stairs, balance and kneel, and could occasionally stoop.  Finally, the ALJ found that Plaintiff could not tolerate exposure to hazards.  He did not incorporate any mental health limitations.

At step four, the ALJ found that, given Plaintiff's RFC, he could perform his past work as a car salesman.  The ALJ also concluded that there are a significant number of other jobs in the national economy that Plaintiff could perform.  He issued his

decision denying Plaintiff's DIB application on July 24, 2018.
The Appeals Council declined to review the ALJ's decision, and
Plaintiff filed this civil action on June 7, 2019.

### Standard of Review

The Social Security Act defines the term "disability" as the
"inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not
less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will
be found disabled only if it is determined that his "impairments
are of such severity that he is not only unable to do his
previous work but cannot, considering his age, education, and
work experience, engage in any other kind of substantial gainful
work which exists in the national economy."  42 U.S.C. §
423(d)(2)(A).

In considering a Commissioner's disability decision, the
court "review[s] the administrative record *de novo* to determine
whether there is substantial evidence supporting the . . .
decision and whether the Commissioner applied the correct legal
standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002)
(citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42
U.S.C. § 405(g).  In its deliberations, a court should bear in
mind that the Social Security Act is "a remedial statute to be

broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

**Discussion**

There are three issues before the Court: (1) whether the ALJ properly found that Plaintiff's mental impairments were not severe; (2) whether the ALJ properly determined that Plaintiff's impairments did not meet or equal Listing 1.05 (regarding medical inability to use a prosthetic device); and (3) whether the ALJ properly weighed the medical opinions in assessing RFC.

## I.   Mental Impairment

At step two of the sequential analysis, the ALJ found that Plaintiff's mental impairments were not severe between 2015 and 2017. Accordingly, the ALJ did not incorporate those limitations into Plaintiff's RFC. Plaintiff contends that the ALJ's conclusion was not supported by substantial evidence.

"[T]he standard for a finding of severity under Step Two of the sequential analysis is *de minimis* and is intended only to screen out the very weakest cases." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014). Here, the ALJ relied in part upon the conclusions reached by the state agency reviewers. Those reviews, however, overlooked or failed to cite several key portions of Plaintiff's mental health record.

As an example, there is no acknowledgment of Ms. Rosales's conclusion that Plaintiff suffered from "severe" depression. AR

1369.  More specifically, Ms. Rosales noted that Plaintiff demonstrated a depressed mood, flat affect, and suicidal ideation.  *Id.*  This latter note, written on December 15, 2016, directly contradicts the ALJ's conclusion that the record lacked any indication of either suicide attempts or suicidal ideas "during the period at issue."  AR 14.

Throughout 2016 and into 2017, Ms. Rosales noted that Plaintiff struggled with pain, depression and anxiety.  In January 2017, she concluded that Plaintiff's major depression was complicated by chronic pain.  As a result, she believed his mood and irritability would interfere with anything more than routine interactions in the workplace, and that he would be unable to handle normal work stress.  These symptoms rise above the *de minimis* level, particularly when considered in the context of Plaintiffs RFC.

Furthermore, the state agency reviewers did not have the benefit of a treatment summary written by Ms. Barth, Plaintiff's treating psychotherapist.  Although the summary was written in 2018, after the insured period and after the state agency psychologists performed their review, Ms. Barth's summary encompassed the 2016-2017 treatment period.  AR 1660.  Her conclusions regarding Plaintiff's significant difficulties with concentration and social functioning were, again, directly relevant to the question of RFC.  The Court therefore finds that

the ALJ's finding at step two was not supported by substantial
evidence.

## II.  Difficulty Using The Prosthetic Leg

The record is replete with notations about Plaintiff's
inability to use his prosthetic leg consistently and/or without
pain.  Nonetheless, the ALJ concluded that he did not meet or
equal listing 1.05, which states in part:

> One or both lower extremities at or above the tarsal
> region, with stump complications resulting in medical
> inability to use a prosthetic device to ambulate
> effectively . . . which have lasted or are expected to
> last for at least 12 months.

20 C.F.R. § 404, Subpart P, App. 1, Listing 1.05B.  The
regulations provide specific guidance on the meaning of "ambulate
effectively."  *See* 20 C.F.R. § 404, Subpart P, App. 1, Listing
1.000B2b.

> To ambulate effectively, individuals must be capable of
> sustaining a reasonable walking pace over a sufficient
> distance to be able to carry out activities of daily
> living.  They must have the ability to travel without
> companion assistance to and from a place of employment
> or school.  Therefore, examples of ineffective
> ambulation include, but are not limited to, the
> inability to walk without the use of a walker, two
> crutches or canes . . . .  The ability to walk
> independently about one's home without the use of
> assistive devices does not, in and of itself,
> constitute effective ambulation.

*Id.*

The ALJ found "no indication that the claimant had stump
complications resulting in an inability to use a prosthetic to
ambulate effectively."  AR 19.  The ALJ cited provider notes

observing that Plaintiff "could ambulate without other assistive devices," and relied on Plaintiff's own reports of dog walking, walking long distances, and fishing.  *Id.*  These observations from the record are outweighed by significant evidence of Plaintiff's inability to walk without assistance, his frequent use of a wheelchair, and the curtailing of activities such as dog walking and fishing.  For example, in those same portions of the record cited in the ALJ's decision, the provider noted that Plaintiff was having "a very slow transition to use of a prosthesis due to chronic neuropathic pain . . . .  He continues to use a combination of walking and wheelchair use for pain management and for limiting distance or duration of weight bearing."  AR 1100.  Although Plaintiff wore his prosthesis to the appointment, he reported that he would have to remove it immediately thereafter due to pain.  *Id.*  Another note similarly indicated problems with the prosthesis, as Plaintiff was suffering from significant nerve pain that was "making it hard to do anything and keeping him awake at night.  The pain is located both laterally and medially and comes with anything touching his amputation."  AR 1238.

The ALJ's citation to walking long distances and fishing is, as Plaintiff argues in his briefing, taken out of context. Plaintiff testified that he had not been fishing in "quite a while," and his prosthetist noted that Plaintiff was compelled to

walk because he did not have a driver's license.  AR 77, 1112.
The record also shows repeated issues with fitting the prosthesis
properly, and offers no indication that Plaintiff was able to
return to an adequate level of functioning.  *See, e.g.*, AR 1112-
1114.

Listing 1.05 states that a claimant must be able to walk
with a prosthetic over a "sufficient distance" without the use of
a cane, crutch, or other assistance.  In this case, Plaintiff has
gone through several adjustments and fittings, yet continued to
experience significant pain and relied on his wheelchair for
relief.  Dr. Charlson opined that Plaintiff's pain was so severe
that Plaintiff would be unable to work.  Dr. Kwock dismissed
Plaintiff's neuropathic pain.  As discussed more fully below, the
ALJ did not give Dr. Charlson's opinion adequate weight.
Consequently, the ALJ's conclusion with regard to whether
Plaintiff's condition meets or equals the condition described in
Listing 1.05 was not supported by substantial evidence.

## III. The Treating Physician

It is well established in Social Security benefits cases
that the opinion of a treating physician must be carefully
considered.  For applications filed prior to March 27, 2017, as
in this case, the regulations required the Commissioner to give
controlling weight to a treating source's opinion so long as it
was "well-supported by medically acceptable clinical and

laboratory diagnostic techniques" and not "inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 416.927(c)(2).  The 2017 regulations changed this standard, such that the Commissioner will (in cases more recent than this one) no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."  *Id.* § 404.1520c(a).  Instead, the Commissioner will consider the following five factors: (1) supportability; (2) consistency; (3) relationship of the source with the claimant, including length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship, and whether the relationship is an examining relationship; (4) the medical source's specialization; and (5) other factors, including but not limited to "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA] disability program's policies and evidentiary requirements." *Id.* § 404.1520c(c).  The regulations continue to acknowledge that a treating source "may have a better understanding of [a claimant's] impairment(s) . . . than if the medical source only reviews evidence in [a claimant's] folder."  20 C.F.R. § 404.1520c(c)(3)(v); *see also Santiago v. Barnhart*, 441 F. Supp. 2d 620, 629 (S.D.N.Y. 2006) (noting in the context of the

treating physician rule that "a physician who has a long history with a patient is better positioned to evaluate the patient's disability than a doctor who observes the patient once").

Under either standard, the ALJ failed to give proper weight to Dr. Charlson's conclusions.  Those conclusions were based on his knowledge of Plaintiff's experience over a period of nearly three years, beginning with the amputation itself.  Dr. Charlson performed the amputation on June 25, 2015.  Plaintiff was fitted for a prosthesis in September 2015, but by November of that year reported that pain at the incision line that made the prosthesis unwearable.  A new prosthesis in mid-2016 resulted in immediate improvement, but within months Plaintiff was again reporting to both Ms. Thomas and Dr. Charlson about continued nerve pain.  Dr. Charlson prescribed gabapentin and recommended physical therapy and massage.

Despite these treatments, Dr. Charlson noted on February 16, 2017 that Plaintiff continued to experience significant nerve pain.  A physical examination revealed irritation over the superficial peroneal nerve.  As discussed previously, Dr. Charlson also believed that Plaintiff was suffering from phantom pain.  He therefore offered his professional opinion that Plaintiff was unable to work given both his physical ailments and the effects of the medication on his ability to concentrate.  AR 1510.  He offered the same opinion in November 2017.  AR 1509.

In May 2018, Dr. Charlson concurred with Mark Coleman's FTE, which concluded that Plaintiff was functioning at a sedentary capacity and might only be able to manage at that level for four out of eight hours per workday.

The record therefore makes clear that Dr. Charlson's opinions were both internally consistent and consistent with those of other evaluators.  While the ALJ criticized Dr. Charlson for relying on subjective reports, it is plain that his evaluations of Plaintiff included physical examinations.  Dr. Charlson is an orthopedic specialist, had a lengthy clinical relationship with the Plaintiff, and was familiar with other evidence supporting Plaintiff's claim.

The regulations provide that the Commissioner's decision will "always give good reasons" for the weight given a treating source's medical opinion.  20 C.F.R. § 404.1527.  Here, the ALJ's reasons for discounting Dr. Charlson's opinions did not rise to that level.  Because he failed to give Dr. Charlson's opinion appropriate weight, the Court finds that his ultimate conclusion with respect to disability was not supported by substantial evidence.

Indeed, if Dr. Charlson's views are given controlling weight, and his concurrence with Mr. Coleman's FTE is also credited, then the hypothetical presented to the vocational expert was off the mark and the expert's conclusions are of no

value.   Although Mr. Coleman's evaluation took place after the insured period, Dr. Charlson's concurrence was the *third* time in two years where he opined, in writing, that Plaintiff was unable to work.   This matter must therefore be remanded for proper consideration of the evidence.

## **Conclusion**

For the reasons set forth above, the Court grants Plaintiff's motion to reverse the decision of the Commissioner (ECF No. 8) and denies the Commissioner's motion to affirm (ECF No. 9).   This case is remanded for further proceedings and a new decision.

DATED at Burlington, in the District of Vermont, this 9th day of October, 2020.


/s/ William K. Sessions
William K. Sessions
District Court Judge